1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

COREY WIMMER,

Plaintiff,

v.

MICHAEL J. ASTRUE, Commissioner of
Social Security,

Defendant.

Case No. 3:10-cv-05370-KLS

ORDER AFFIRMING DEFENDANT'S
DECISION TO DENY BENEFITS

Plaintiff has brought this matter for judicial review of defendant's denial of his

application for supplemental security income ("SSI") benefits.  Pursuant to 28 U.S.C. § 636(c),

Federal Rule of Civil Procedure 73 and Local Rule MJR 13, the parties have consented to have

this matter heard by the undersigned Magistrate Judge.  After reviewing the parties' briefs and

the remaining record, the Court hereby finds that for the reasons set forth below, defendant's

decision to deny benefits should be affirmed.

FACTUAL AND PROCEDURAL HISTORY

On July 26, 2006, plaintiff filed an application for SSI benefits, alleging disability as of

February 9, 2006, due to epilepsy. See Tr. 13, 123, 134.  His application was denied upon initial

ORDER - 1

administrative review and on reconsideration. See Tr. 13, 66, 71.  A hearing was held before an administrative law judge ("ALJ") on August 10, 2009, at which plaintiff, represented by counsel, appeared and testified, as did a plaintiff's mother and a vocational expert. See Tr. 13, 23-63.

On September 29, 2009, the ALJ issued a decision in which plaintiff was determined to be not disabled. See Tr. 13-22.  Plaintiff's request for review of the ALJ's decision was denied by the Appeals Council on April 20, 2010, making the ALJ's decision defendant's final decision. See Tr. 1; see also 20 C.F.R. § 416.1481.  On May 25, 2010, plaintiff filed a complaint in this Court seeking judicial review of the ALJ's decision. See ECF #1-#3.  The administrative record was filed with the Court on August 3, 2010. See ECF #11.  The parties have completed their briefing, and thus this matter is now ripe for the Court's review.

Plaintiff argues defendant's decision should be reversed and remanded for an award of benefits or, in the alternative, for further administrative proceedings before a different ALJ, because the above ALJ erred: (1) in determining his depression and anxiety to be non-severe impairments; (2) in failing to address 20 C.F.R. Part 404, Subpart P, Appendix 1, §§ 11.02, 11.03 ("Listing 11.02" and "Listing 11.03"); (3) in assessing his credibility; (4) in rejecting the lay testimony of his mother; and (5) in finding him to be capable of performing other work existing in significant numbers in the national economy.  But for the reasons set forth below, the Court disagrees that defendant erred in determining plaintiff to be not disabled, and therefore hereby finds that defendant's decision should be affirmed.

<u>DISCUSSION</u>

This Court must uphold defendant's determination that plaintiff is not disabled if the proper legal standards were applied and there is substantial evidence in the record as a whole to support the determination. See Hoffman v. Heckler, 785 F.2d 1423, 1425 (9th Cir. 1986).

ORDER - 2

Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. See Richardson v. Perales, 402 U.S. 389, 401 (1971); Fife v. Heckler, 767 F.2d 1427, 1429 (9th Cir. 1985).  It is more than a scintilla but less than a preponderance. See Sorenson v. Weinberger, 514 F.2d 1112, 1119 n.10 (9th Cir. 1975); Carr v. Sullivan, 772 F. Supp. 522, 524-25 (E.D. Wash. 1991).  If the evidence admits of more than one rational interpretation, the Court must uphold defendant's decision. See Allen v. Heckler, 749 F.2d 577, 579 (9th Cir. 1984).

I.      The ALJ's Step Two Findings

Defendant employs a five-step "sequential evaluation process" to determine whether a claimant is disabled. See 20 C.F.R. § 404.1520; 20 C.F.R. § 416.920.  If the claimant is found disabled or not disabled at any particular step thereof, the disability determination is made at that step, and the sequential evaluation process ends. See id.  At step two of that process, the ALJ must determine if an impairment is "severe." 20 C.F.R. § 416.920.  An impairment is "not severe" if it does not "significantly limit" a claimant's mental or physical abilities to do basic work activities. 20 C.F.R. § 416.920(a)(4)(iii), (c); see also Social Security Ruling ("SSR") 96-3p, 1996 WL 374181 *1.  Basic work activities are those "abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 416.921(b); SSR 85- 28, 1985 WL 56856 *3.

An impairment is not severe only if the evidence establishes a slight abnormality that has "no more than a minimal effect on an individual[']s ability to work." See SSR 85-28, 1985 WL 56856 *3; see also Smolen v. Chater, 80 F.3d 1273, 1290 (9th Cir. 1996); Yuckert v. Bowen, 841 F.2d 303, 306 (9th Cir.1988).  Plaintiff has the burden of proving that his "impairments or their symptoms affect [his] ability to perform basic work activities." Edlund v. Massanari, 253 F.3d 1152, 1159-60 (9th Cir. 2001); Tidwell v. Apfel, 161 F.3d 599, 601 (9th Cir. 1998).  The step

two inquiry described above, however, is a *de minimis* screening device used to dispose of

groundless claims. See Smolen, 80 F.3d at 1290.

In this case, the ALJ found plaintiff had "severe" impairments consisting of a seizure

disorder, cannabis dependence, and polysubstance abuse. See Tr. 15.  In addition, the ALJ found

that although the medical evidence in the record did reveal "diagnoses of depression, anxiety,

and [a] panic disorder without agoraphobia," those impairments did "not appear to be severe or

cause work-related limitations," explaining further in relevant part that:

> . . . The claimant did not testify to any psychological problems.  He failed to
> attend two consultative evaluations scheduled by the State agency.  The
> claimant questioned the necessity of a psychiatric evaluation and stated "My
> problem is physical" (Exhibit 7F at page 13).  Despite the psychological
> findings noted above, the claimant has not sought any treatment except for
> medication.  While the claimant may have some depression due to his
> seizure disorder, his depression is not severe enough to impose limitations on
> work functions.

Tr. 15, 19.  Plaintiff argues the ALJ erred in so finding, noting that Donna M. Smith, Psy.D., an

examining psychologist, found in a psychiatric/psychological evaluation form she completed that

he was moderately limited in his ability to understand, remember and follow complex (i.e., more

than two step) instructions, exercise judgment and make decisions, respond appropriately to and

tolerate the pressures and expectations of a normal work setting, and control physical or motor

movements and maintain appropriate behavior. See Tr. 327.

In regard to Dr. Smith's evaluation report, the ALJ found as follows:

> In May 2007, Donna M. Smith, PsyD, conducted a mental health evaluation.
> The claimant reported that his depression and anxiety started when his
> seizures returned.  He reported that he quit school in ninth grade when he was
> placed in juvenile detention for selling methamphetamine.  He obtained a
> GED in 1997.  Dr. Smith noted marked symptoms of depressed mood (poor
> sleep, irritability, lack of energy and motivation), social withdrawal (few
> friends, does not trust anyone), and motor retardation (frequently on daily
> basis).  On mental status examination, the claimant was able to perform
> seria13s and 7s with one error.  His immediate and long-term memory was

ORDER - 4

intact.  He recalled one out of three words after five minutes.  Dr. Smith diagnosed mood disorder due to grand mal seizures (depressed) and panic disorder without agoraphobia. Dr. Smith noted that the claimant last worked in February 2007.  He stocked at Grocery Outlet.  The claimant reported that he quit because he "wasn't getting enough hours."  He reported that when he worked he did not feel depressed and his anxiety went away.  Dr. Smith opined that the claimant's depression and anxiety were not keeping him from working (Exhibit l6F).

Tr. 18.  Plaintiff does not challenge the ALJ's analysis of Dr. Smith's evaluation report.  Indeed, that report does show that despite the above moderate functional limitations Dr. Smith checked earlier in her evaluation report, she concluded emphatically that depression and anxiety were "NOT keeping [plaintiff] from working," but rather per plaintiff's own report, it was his seizure disorder that did so. Tr. 328 (emphasis in original).  It also expressly was noted by Dr. Smith that plaintiff informed her he "doesn't feel depressed" and his "[a]nxiety goes away for the most part when he is working." Tr. 327.

Plaintiff argues the fact that he was focused on his physical limitations at the time he saw Dr. Smith and lacked insight into his mental impairments, does not excuse the ALJ for having a similar lack of insight.  It is not at all clear, however, that plaintiff was merely "focused" on his physical limitations when he was seen by Dr. Smith, as opposed to merely the fact that as noted by Dr. Smith, he really did not view himself as being hindered in his ability to work by a mental health condition.  Nor has plaintiff pointed to any evidence in the record indicating that he lacked insight into his condition.  Plaintiff further argues the moderate functional limitations checked by Dr. Smith should trump his own self-reporting in this regard, but as discussed above, Dr. Smith clearly agreed that from a mental functional point of view, he was not hindered from being able to work.  Accordingly, the Court finds the ALJ did not err in adopting Dr. Smith's conclusion in this regard, and constitutes Dr. Smith's actual overall opinion concerning the mental functional capability of plaintiff. See Magallanes v. Bowen, 881 F.2d 747, 755, (9th Cir. 1989) (court may

ORDER - 5

draw specific and legitimate inferences from ALJ's opinion).

II.     The ALJ's Step Three Determination

At step three of the sequential disability evaluation process, the ALJ must evaluate the claimant's impairments to see if they meet or medically equal any of the impairments listed in 20 C.F. R. Part 404, Subpart P, Appendix 1 (the "Listings"). See 20 C.F.R § 416.920(d); Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999).  If any of the claimant's impairments meet or medically equal a listed impairment, he or she is deemed disabled. Id.  The burden of proof is on the claimant to establish he or she meets or equals any of the impairments in the Listings. See Tacket, 180 F.3d at 1098.  "A generalized assertion of functional problems," however, "is not enough to establish disability at step three." Id. at 1100 (citing 20 C.F.R. § 404.1526).

A mental or physical impairment "must result from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. § 404.1508, § 416.908.  It must be established by medical evidence "consisting of signs, symptoms, and laboratory findings." Id.; see also SSR 96-8p, 1996 WL 374184 *2 (determination that is conducted at step three must be made on basis of medical factors alone).  An impairment meets a listed impairment "only when it manifests the specific findings described in the set of medical criteria for that listed impairment." SSR 83-19, 1983 WL 31248 *2.

An impairment, or combination of impairments, equals a listed impairment "only if the medical findings (defined as a set of symptoms, signs, and laboratory findings) are at least equivalent in severity to the set of medical findings for the listed impairment." Id.; see also Sullivan v. Zebley, 493 U.S. 521, 531 (1990) ("For a claimant to qualify for benefits by showing that his unlisted impairment, or combination of impairments, is 'equivalent' to a listed

ORDER - 6

impairment, he must present medical findings equal in severity to all the criteria for the one most similar listed impairment.") (emphasis in original).  However, "symptoms alone" will not justify a finding of equivalence. <u>Id.</u>  The ALJ also "is not required to discuss the combined effects of a claimant's impairments or compare them to any listing in an equivalency determination, unless the claimant presents evidence in an effort to establish equivalence." <u>Burch v. Barnhart</u>, 400 F.3d 676 (9th Cir. 2005).

The ALJ need not "state why a claimant failed to satisfy every different section of the listing of impairments." <u>Gonzalez v. Sullivan</u>, 914 F.2d 1197, 1201 (9th Cir. 1990) (finding ALJ did not err in failing to state what evidence supported conclusion that, or discuss why, claimant's impairments did not meet or exceed Listings).  This is particularly true where, as noted above, the claimant has failed to set forth any reasons as to why the Listing criteria have been met or equaled. <u>Lewis v. Apfel</u>, 236 F.3d 503, 514 (9th Cir. 2001) (finding ALJ's failure to discuss combined effect of claimant's impairments was not error, noting claimant offered no theory as to how, or point to any evidence to show, his impairments combined to equal a listed impairment).

The ALJ found in this case that plaintiff did not have an impairment or a combination of impairments, which met or medically equaled the criteria of any impairment contained in the Listings, and expressly determined that neither Listing 12.04 (affective disorders) nor Listing 12.09 (substance addiction disorders) had been met or medically equaled. <u>See</u> Tr. 16.  Plaintiff argues the ALJ erred by not addressing whether his seizure disorder met or medically equaled Listings 11.02 (convulsive epilepsy) or 11.03 (non-convulsive epilepsy).  Specifically, plaintiff argues the ALJ was required to expressly address those Listings, since she found at step two that his seizure disorder was a severe impairment.  The Court disagrees.

As noted above, the ALJ need not "state why a claimant failed to satisfy every different

ORDER - 7

section of the listing of impairments." <u>Gonzalez</u>, 914 F.2d at 1201 (9th Cir. 1990) (ALJ did not err in failing to state what evidence supported conclusion that, or discuss why, claimant's impairments did not meet or exceed Listings).[1]  Contrary to plaintiff's assertions, furthermore, the medical evidence in the record fails to support a finding that Listing 11.02 or Listing 11.03 have been met or medically equaled in this case.  Nor, also as plaintiff asserts, did the lack of any express discussion of these two Listings by the ALJ make it impossible for a court reviewing the ALJ's decision to determine the propriety of her step three findings here.

The Listings regarding epilepsy provide in relevant part as follows:

---

[1]  Plaintiff cites <u>Frost v. Barnhart</u>, 314 F.3d 359 (9th Cir. 2002), for the proposition that it was legally significant that the ALJ did not mention Listing 11.02 or 11.03 here.  However, <u>Frost</u> is not on point.  The district court in that case found the ALJ did not err in failing to expressly address the "B" criteria of Listing 12.06 (anxiety-related disorders), because they matched "B" criteria of Listing 12.03 (psychotic disorders), neither of which is at issue here. <u>Id.</u> at 363. The Court of Appeals went on state in relevant part that:

> This reasoning is correct, so far as it goes. But the Magistrate Judge overlooked an important point, namely, that in both [Listings] part C provides an alternative means of demonstrating disability for those claimants who previously met the [Listing's] standards and whose symptoms have been treated by medication but who still could not function alone in a work environment.

> Here, the ALJ found that [the claimant] was disabled from May 16, 1996 to October 31, 1997 because he then met the requirements of sections 12.06A and B.  She found that during that period he met the requirements in section 12.06B3 and 12.06B4.  The ALJ found that after October 31, 1997, [the claimant] satisfied only the requirement in 12.06B4.  Because a claimant must satisfy two of the B criteria, she found that he was no longer disabled.

> Since the ALJ did not evaluate [the claimant] at all under section 12.03, she did not discuss the requirements of section 12.03A, nor did she consider the possible application of 12.03B or 12.03C.  It is possible, however, that [the claimant] satisfied the requirements of 12.03A and 12.03B during the period in which she held he was disabled under section 12.06.  If so, he satisfied the threshold requirements for consideration under 12.03C.  Consequently, it is possible that he could have been classified as disabled on that basis even after October 31, 1997, if he was able to show that at some point he had met the requirements of 12.03A and B, and that currently he was subject to repeated episodes of deterioration or had a documented current history of two or more years of inability to function outside of a highly supportive living situation.

<u>Id.</u>; <u>see also</u> 20 C.F.R. Pt. 404, Subpt. P, App. 1, §12.00A (stating that each Listing, except Listings 12.05 and 12.09, consists of statement describing that Listing's particular disorder, paragraph A criteria (set of medical findings) and paragraph B criteria (set of impairment-related functional limitations), with additional functional criteria (paragraph C criteria) for Listings 12.02, 12.03, 12.04, and 12.06).  Such is not the case here, however, in that as discussed herein, there is no reliable evidence in the record that plaintiff's seizure disorder had ever met or medically equaled any of the criteria of Listing 11.02 or Listing 11.03.

ORDER - 8

11.00 Neurological

A.  Epilepsy.  In epilepsy, regardless of etiology, degree of impairment will be determined according to type, frequency, duration, and sequelae of seizures.  At least one detailed description of a typical seizure is required.  Such description includes the presence or absence of aura, tongue bites, sphincter control, injuries associated with the attack, and postictal phenomena.  The reporting physician should indicate the extent to which description of seizures reflects his own observations and the source of ancillary information.  Testimony of persons other than the claimant is essential for description of type and frequency of seizures if professional observation is not available.

Under 11.02 and 11.03, the criteria can be applied only if the impairment persists despite the fact that the individual is following prescribed antiepileptic treatment.  Adherence to prescribed antiepileptic therapy can ordinarily be determined from objective clinical findings in the report of the physician currently providing treatment for epilepsy.  Determination of blood levels of phenytoin sodium or other antiepileptic drugs may serve to indicate whether the prescribed medication is being taken. . . .

. . .

11.02  Epilepsy--convulsive epilepsy, (grand mal or psychomotor), documented by detailed description of a typical seizure pattern, including all associated phenomena; occurring more frequently than once a month in spite of at least 3 months of prescribed treatment.

A. Daytime episodes (loss of consciousness and convulsive seizures) or

B. Nocturnal episodes manifesting residuals which interfere significantly with activity during the day.

11.03 Epilepsy--nonconvulsive epilepsy (petit mal, psychomotor, or focal), documented by detailed description of a typical seizure pattern, including all associated phenomena; occurring more frequently than once weekly in spite of at least 3 months of prescribed treatment.  With alteration of awareness or loss of consciousness and transient postictal manifestations of unconventional behavior or significant interference with activity during the day.

20. C.F.R. Pt. 404, Subpt. P, App. 1, §§ 11.00-11.03 (emphasis added).  Plaintiff first argues the

ALJ erred by not making a specific finding regarding the frequency of his seizures, and therefore

the ALJ's decision is incomplete regarding this issue.  But plaintiff has failed to meet his burden

of proof in regard to the requisite frequency thereof.

ORDER - 9

Plaintiff argues both his testimony and that of his mother show he has experienced one or two convulsive seizure episodes a month, and therefore he meets the criteria of Listing 11.02.[2] However, as discussed in greater detail below, the ALJ did not err in discounting the credibility of plaintiff or his mother regarding his alleged disabling impairments.  As such, the ALJ was not required to accept either of their testimony concerning the number of seizures experienced. Further, the ALJ expressly found the medical evidence in the record contradicted their testimony that plaintiff had experienced multiple seizures per month, a finding clearly supported by the substantial evidence in the record.  Indeed, the record shows his seizures occurred at much less frequency during the time period relevant to this matter.

Plaintiff apparently experienced a seizure in late June 2006, for the first time in 10 to 12 years. See Tr. 208, 219, 236, 291, 295.  He reported experiencing another seizure in early August 2006, as well. See Tr. 289.  Plaintiff again reported having had a seizure in late December 2006. See Tr. 245, 284.  In late September 2007, plaintiff indicated to his treating physician that he had "actually been doing well for the past year," having experienced only "two seizures" during that time: one on April 28, and another one on July 11. Tr. 679.  In late November 2007, plaintiff was diagnosed with a "[p]ossible seizure." Tr. 474.  Plaintiff reported experiencing another seizure in late January 2008, while in his jail cell. See Tr. 571.  He again was diagnosed with a generalized epileptic seizure in early July 2008, and with a chronic seizure in late August 2008. See Tr. 378, 403, 406.  In late October 2008, plaintiff reported that he felt he was going to have a seizure, but it is not clear that he actually experienced on at that time. See Tr. 520.

While plaintiff reported in late December 2008, last having a seizure in November 2008 (see Tr. 530), he reported in mid-March 2009, as having "been well controlled for his seizures

---

[2] Plaintiff asserts Listing 11.02 is met if he experiences convulsive seizures at least once a month, but as clearly can be seen above, that Listing expressly provides that seizures must occur "more frequently" than that.

ORDER - 10

since" October 2008, due to an increase in his medication (see Tr. 668).  In late February 2009, however, plaintiff reported that "his last seizure was in August." Tr. 655.  In On May 4, 2009, he again was diagnosed with a "[p]ossible seizure." Tr. 581.  Five days later he reported "having a history of having one seizure per month," with his last one being in December 2008, but went on to state that since he had been "clean and sober without use of alcohol or marijuana, his seizures" were "far better controlled."[3] Tr. 585.  In early June 2009, plaintiff stated that he was "having a seizure about once every two months." Tr. 676.  Accordingly, contrary to plaintiff's testimony, it appears he experienced only three seizures each more than a month apart in 2006, another two and a possible third again each more than a month apart in 2007, three in mostly non-consecutive months in 2008 – although he may have had another possible one or two later that year as well – and only one possible seizure in 2009.

Plaintiff thus has not met the frequency requirement for either Listing 11.02 or Listing 11.03.  While plaintiff asserts he "does not go to the hospital every time he has as [sic] seizure, and in fact, is sometimes not aware that he has had one," this hardly supports a finding that his seizure disorder meets or medically equals Listings 11.02 or 11.03.  Indeed, such a finding may not be based merely on a claimant's claim that his or her seizures have occurred at the required rate, without any actual documentation in the record, particularly where, as in this case, the ALJ properly discounts the claimant's credibility regarding his symptoms and limitations.  Further, as noted above, the Listing 11.02 and 11.03 criteria will be met or medically equaled only where "the impairment persists despite the fact that the individual is following prescribed antiepileptic treatment." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 11.00A.

Although not stated specifically in the context of his step three findings, the ALJ found in

---

[3] This latter statement by plaintiff also clearly contradicts plaintiff's claim in his opening brief that there is nothing in the medical record to suggest that substance abuse has contributed to his seizures. See ECF #13, p. 11.

relevant part in regard to plaintiff's treatment compliance as follows:

> In terms of the claimant's alleged seizure disorder, treatment notes show that the claimant has not been compliant with treatment and has engaged in possible substance abuse. In July 2007, the claimant reported . . . that he was using his medications erratically and had not been taking his medications as prescribed. He requested a referral to East Center Recovery. He had already reportedly made contact with the treatment facility about entering their program for substance abuse (Exhibit 32F at page 14). On September 27, 2007, Dr. [John J.] Miller[, M.D.], plaintiff's treating neurologist] stated, "I have discussed the issue of noncompliance with the patient. At this point, he has had multiple no shows to our office" (Exhibit 30F at page 5). In May 2008, Dr. Miller noted that the he had the claimant monitored in Seattle for seizure activity but he left against medical advice (Exhibit 30F at page 3). On June 8, 2009, Dr. Miller stated that he had seen the claimant intermittently over several years because of epilepsy. He stated that the claimant had been noncompliant on several occasions. He noted that the claimant was recently in drug rehab because he was abusing Lorazepam (Exhibit 30F at page 1).

Tr. 20. The substantial evidence in the record overall supports the ALJ in finding that plaintiff had issues maintaining compliance in regard to treatment prescribed for his seizure disorder. See Tr. 247, 284-87, 291, 295, 297, 315, 676, 678-80, 693, 695. Thus, he has not met or medically equaled the criteria for Listing 11.02 or Listing 11.03 on this basis as well.

Plaintiff argues the Listings for epilepsy refer only to prescribed antiepileptic drugs, but clearly this is not the case, given that Listing 11.00A expressly refers to "prescribed antiepileptic treatment," and not just medication. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 11.00A (emphasis added). Listing 11.00A goes on to state that "[a]dherence to prescribed antiepileptic therapy," as opposed to medication only, "can ordinarily be determined from objective clinical findings in the report of the physician currently providing treatment for epilepsy." Id. (emphasis added). Thus, while it may be that plaintiff was fairly compliant with the medications prescribed for his seizure disorder (but see Tr. 285 (emphasizing need for "medication compliance" as much as possible)), clearly he was non-compliant in regard to other aspects of treatment, as specifically noted several times by his treating neurologist (see Tr. 284-85, 678, 680, 693). In addition, while the record

ORDER - 12

does reveal plaintiff may have had problems with maintaining health insurance coverage at times in regard to his medication (see Tr. 678), this does not explain all of the other compliance issues Dr. Miller expressly noted, including the "multiple no shows" plaintiff had for scheduled office visits (see Tr. 284, 676, 678, 680).

III.    The ALJ's Assessment of Plaintiff's Credibility

Questions of credibility are solely within the control of the ALJ. See Sample v. Schweiker, 694 F.2d 639, 642 (9th Cir. 1982).  The Court should not "second-guess" this credibility determination. Allen, 749 F.2d at 580.  In addition, the Court may not reverse a credibility determination where that determination is based on contradictory or ambiguous evidence. See id. at 579.  That some of the reasons for discrediting a claimant's testimony should properly be discounted does not render the ALJ's determination invalid, as long as that determination is supported by substantial evidence. Tonapetyan v. Halter, 242 F.3d 1144, 1148 (9th Cir. 2001).

To reject a claimant's subjective complaints, the ALJ must provide "specific, cogent reasons for the disbelief." Lester, 81 F.3d at 834 (citation omitted).  The ALJ "must identify what testimony is not credible and what evidence undermines the claimant's complaints." Id.; see also Dodrill v. Shalala, 12 F.3d 915, 918 (9th Cir. 1993).  Unless affirmative evidence shows the claimant is malingering, the ALJ's reasons for rejecting the claimant's testimony must be "clear and convincing." Lester, 81 F.2d at 834.  The evidence as a whole must support a finding of malingering. See O'Donnell v. Barnhart, 318 F.3d 811, 818 (8th Cir. 2003).

In determining a claimant's credibility, the ALJ may consider "ordinary techniques of credibility evaluation," such as reputation for lying, prior inconsistent statements concerning symptoms, and other testimony that "appears less than candid." Smolen, 80 F.3d at 1284.  The

1   ALJ also may consider a claimant's work record and observations of physicians and other third

2   parties regarding the nature, onset, duration, and frequency of symptoms. See id.

3          The ALJ in this case discounted plaintiff's credibility in part on the basis that he has not

4   been compliant with treatment as noted above. See Tr. 20.  Failure to assert a good reason for not

5   seeking, or following a prescribed course of, treatment, or a finding that a proffered reason is not

6   believable, "can cast doubt on the sincerity of the claimant's pain testimony." Fair v. Bowen, 885

7   F.2d 597, 603 (9th Cir. 1989).  Plaintiff does not challenge this stated basis for finding him to be

8   not fully credible, and as discussed above, the ALJ's findings in this regard are supported overall

9   by the substantial evidence in the record.

10         The ALJ also discounted plaintiff's credibility in part for the following reason:

11         The claimant has provided several different accounts with regard to the
           number of seizures he has reportedly had.  For example, in June 2008, the
12         claimant reported that he had thirty seizures the previous month (Exhibit 32F
           at page 11).  However, at hearing, the claimant testified that he had seizures
13         one to three times a month.  In May 2008, the claimant told Dr. Miller he was
           doing fairly well on Keppra.  In September 2007, the claimant told Dr. Miller
14         that he had done well for the past year and had two seizures (Exhibit 30F).

15   Tr. 20.  This too was a valid basis for not finding plaintiff to be entirely credible. See Smolen, 80

16   F.3d at 1284 (ALJ may consider claimant's prior inconsistent statements concerning symptoms).

17   Plaintiff disagrees, arguing that the frequency with which his seizures occur is inconsistent, that

18   they come in clusters and that he reported the truth as it was at the time he was asked.  However,

19   as discussed above, the record shows – and largely by plaintiff's own report it should be noted –

20   that he has experienced far fewer seizures during the relevant time period than the 30 seizures he

21   reported in June 2008, or the one to three times per month he testified at the hearing that he has

22   experienced.  Nor does the record show, as plaintiff now asserts, that the seizures occurred in

ORDER - 14

clusters, except to the extent one to two seizures over the course of a two to three month period once or so a year can be considered clustering.

Lastly, the ALJ discounted plaintiff's credibility in part because:

The claimant's activities of daily living are inconsistent with a disabling seizure disorder. The claimant testified that he rode the bus two to three times a week, sometimes alone and sometimes with a friend. He goes to NA [narcotics anonymous] meetings and the library. He does his own laundry and he is able to sweep and vacuum. He stated that he uses the computer at the library, has a My Space page, socializes with friends, reads non-fiction books, and watches television. He also reported that he cooked, cared for his child, and shopped (Exhibit 4E).

Tr. 20. To determine whether a claimant's symptom testimony is credible, the ALJ may consider his or her daily activities. See Smolen, 80 F.3d at 1284. Such testimony may be rejected if the claimant "is able to spend a substantial part of his or her day performing household chores or other activities that are transferable to a work setting." Id. at 1284 n.7. The claimant need not be "utterly incapacitated" to be eligible for disability benefits, however, and "many home activities may not be easily transferable to a work environment." Id.

Plaintiff argues, and the Court agrees, that the activities outlined by the ALJ above do not necessarily establish plaintiff is able to spend a substantial part of his day performing household chores or other activities transferable to a work setting. See id.; see also Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998) (recognizing that disability claimants should not be penalized for attempting to lead normal lives in face of their limitations); Orn v. Astrue 495 F.3d 625, 639 (9th Cir. 2007) (finding reading and watching television to be such undemanding activities that they cannot be said to bear meaningful relationship to activities of workplace). Nevertheless, the fact that one of the reasons for discounting plaintiff's credibility was improper, does not render the ALJ's credibility determination invalid, as long as that determination is supported by substantial evidence in the record in light of the other valid reasons for discounting plaintiff's credibility the

ORDER - 15

ALJ provided, as it is in this case. <u>Tonapetyan</u>, 242 F.3d at 1148.

IV.    The ALJ's Evaluation of the Lay Witness Evidence in the Record

Lay testimony regarding a claimant's symptoms "is competent evidence that an ALJ must take into account," unless the ALJ "expressly determines to disregard such testimony and gives reasons germane to each witness for doing so." <u>Lewis</u>, 236 F.3d at 511.  In rejecting lay testimony, the ALJ need not cite the specific record as long as "arguably germane reasons" for dismissing the testimony are noted, even though the ALJ does "not clearly link his determination to those reasons," and substantial evidence supports the ALJ's decision. <u>Id.</u> at 512.  The ALJ also may "draw inferences logically flowing from the evidence." <u>Sample</u>, 694 F.2d at 642.

As noted above, plaintiff's mother testified at the hearing, providing her observations of plaintiff's symptoms and limitations. <u>See</u> Tr. 57-62.  In his decision, the ALJ address plaintiff's mother's testimony as follows:

> Ms. Wimmer's testimony is given some weight with regard to information about the claimant's seizure condition as child.  However, she testified the claimant had only recently started living with her.  Her testimony that the claimant had multiple seizures per month since July 2006 is contradicted by Dr. Miller's record.

Tr. 21.  Plaintiff argues these are not germane reasons for rejecting his mother's testimony.  The Court disagrees.  First, as noted by the ALJ, plaintiff's mother testified at the August 10, 2009 hearing that he "only recently started living with her," specifically since only May of that year. <u>Id.</u>; <u>see also</u> Tr. 58.  The fact that plaintiff's mother had been living with plaintiff for less than three months at the time of her testimony, does call into question the extent to which she based her testimony on her own personal observations, and this is germane to her.

Plaintiff further argues the ALJ erred in rejecting his mother's testimony that he had had multiple seizures per month since July 2006, on the basis that it was inconsistent with the records

ORDER - 16

provided by Dr. Miller.  Specifically, plaintiff asserts Dr. Miller was not the only medical source to treat him, that he did not always get treatment after experiencing a seizure and thus that "it is quite likely that his mother was aware of seizures that Dr. Miller did not know about." ECF #13, pp. 10-11.  But as discussed above, neither the ALJ nor the Court can rely on evidence that is not supported by the record to find a claimant to be disabled.  That is, plaintiff would have the Court ignore the substantial evidence in the record indicating his seizures were fairly infrequent on the basis that his mother possibly knew of others not reported to plaintiff's treatment providers, even though there is nothing in the record to support that testimony.

The fact that plaintiff claims he did not always get treatment for his seizure disorders also suffers from the same defect.  In other words, there is nothing in the record to support this claim other than plaintiff's own testimony or that of his mother, both of which, as discussed herein, the ALJ properly found to be not fully credible.  In addition, the fact that plaintiff saw other medical providers is irrelevant, in light of the fact that, also as discussed above, the substantial medical evidence in the record overall – not just Dr. Miller's records – fail to support plaintiff's assertion or the testimony of his mother that he experienced multiple seizures per month.

Plaintiff lastly argues that it was improper for the ALJ to discount his mother's testimony on the basis that it was inconsistent with the medical evidence in the record in light of the Ninth Circuit's recent ruling in <u>Bruce v. Astrue</u>, 557 F.3d 1113 (9th Cir. 2009).  It is true that in <u>Bruce</u> the Court of Appeals held that the claimant's wife's testimony could not be discredited "as not supported by medical evidence in the record." <u>Id.</u> at 1116.  In so holding, the Ninth Circuit relied on its prior decision in <u>Smolen</u>, 80 F.3d 1273 (9th Cir. 1996), which held that the ALJ in that case improperly rejected the testimony of the claimant's family on the basis that medical records did not corroborate the claimant's symptoms, because in so doing, the ALJ violated defendant's

directive "to consider the testimony of lay witnesses where the claimant's alleged symptoms are unsupported by her medical records." <u>Bruce</u>, 557 .3d at 1116 (citing 80 F.3d at 1289) (emphasis in original).

The Ninth Circuit in <u>Bruce</u>, however, did not address two earlier decisions in which it expressly held that "[o]ne reason for which an ALJ my discount lay testimony is that it conflicts with medical evidence." <u>Lewis v. Apfel</u>, 236 F.3d 503, 511 (9th Cir. 2001) (citing <u>Vincent</u> <u>v.</u> <u>Heckler</u>, 739 F.2d 1393, 1995 (9th Cir. 1984) (ALJ properly discounted lay testimony that conflicted with available medical evidence)). Accordingly, although <u>Bruce</u> is the Ninth Circuit's most recent pronouncement on this issue, given that no mention of either <u>Lewis</u> or <u>Vincent</u> were made in that case, and that neither of the holdings in those two earlier cases concerning this issue were expressly reversed, it is not at all clear that rejecting lay witness evidence on the basis of it not being supported by the medical evidence in the record is no longer allowed.

Nevertheless, that apparent conflict in Ninth Circuit precedent does not prevent resolution of this issue in this case. First, as discussed above, the ALJ provided another germane reason for rejecting the testimony of plaintiff's mother, namely that he had begun living with her only very recently at the time of the hearing, therefore calling into question the extent and reliability of her personal knowledge of his seizure frequency. In addition, in referring to "Dr. Miller's record" in this instance, the ALJ was not actually finding plaintiff's mother's testimony was unsupported by the medical evidence in the record, but rather that the reports of seizure activity Dr. Miller noted therein were inconsistent therewith. That is, the ALJ's reference to the record here is more akin to a finding of inconsistency with other evidence in the record than the lack of objective medical support basis frowned upon by the Ninth Circuit in <u>Bruce</u>.

ORDER - 18

V.    The ALJ's Step Five Determination

If a disability determination "cannot be made on the basis of medical factors alone at step three of the [sequential disability] evaluation process," the ALJ must identify the claimant's "functional limitations and restrictions" and assess his or her "remaining capacities for work-related activities." SSR 96-8p, 1996 WL 374184 *2. A claimant's residual functional capacity ("RFC") assessment is used at step four to determine whether he or she can do his or her past relevant work, and at step five to determine whether he or she can do other work. See id. It thus is what the claimant "can still do despite his or her limitations." Id.

A claimant's residual functional capacity is the maximum amount of work the claimant is able to perform based on all of the relevant evidence in the record. See id. However, an inability to work must result from the claimant's "physical or mental impairment(s)." Id. Thus, the ALJ must consider only those limitations and restrictions "attributable to medically determinable impairments." Id. In assessing a claimant's RFC, the ALJ also is required to discuss why the claimant's "symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical or other evidence." Id. at *7.

In this case, after step three of the sequential disability evaluation process but before step four thereof, the ALJ assessed plaintiff with the residual functional capacity to perform medium exertional work, with the additional non-exertional limitations that he should not climb ladders, ropes or scaffolds, must avoid heights and dangerous or moving machinery and should not drive or operate heavy equipment.[4] See Tr. 17. At step four of that process, the ALJ found plaintiff to be capable of performing his past relevant work. See Tr. 21. The ALJ then went on to step five,

[4] "Exertional limitations" are those that only affect the claimant's "ability to meet the strength demands of jobs." 20 C.F.R. § 404.1569a(b). "Nonexertional limitations" only affect the claimant's "ability to meet the demands of jobs other than the strength demands." 20 C.F.R. § 404.1569a(c)(1).

ORDER - 19

in which the ALJ must show there are a significant number of jobs in the national economy the claimant is able to do. See Tackett v. Apfel, 180 F.3d 1094, 1098-99 (9th Cir. 1999); 20 C.F.R. § 416.920(d), (e).  The ALJ can do this either through the testimony of a vocational expert or by reference to defendant's Medical-Vocational Guidelines. See Tackett, 180 F.3d at 1100-1101; Osenbrock v. Apfel, 240 F.3d 1157, 1162 (9th Cir. 2000).

An ALJ's findings at step five will be upheld if the weight of the medical evidence in the record supports the hypothetical question he or she poses to the vocational expert. See Martinez v. Heckler, 807 F.2d 771, 774 (9th Cir. 1987); Gallant v. Heckler, 753 F.2d 1450, 1456 (9th Cir. 1984).  Accordingly, the vocational expert's testimony must be reliable in light of the medical evidence to qualify as substantial evidence. See Embrey v. Bowen, 849 F.2d 418, 422 (9th Cir. 1988).  The ALJ's description of the claimant's disability, therefore, "must be accurate, detailed, and supported by the medical record." Id. (citations omitted).  However, the ALJ may omit from that description those limitations that he or she finds do not exist. See Rollins v. Massanari, 261 F.3d 853, 857 (9th Cir. 2001).

At the hearing, the ALJ posed a hypothetical question to the vocational expert containing substantially the same limitations as those that were included in the ALJ's RFC assessment. See Tr. 53-54.  In response thereto, the vocational expert testified that a hypothetical individual with those limitations and the same age, education and work background as plaintiff, would be able to perform other jobs. See Tr. 55-56.  Based on the vocational expert's testimony, the ALJ found plaintiff to be capable of performing other jobs existing in significant numbers in the national economy. See Tr. 21.

Plaintiff argues that when the vocational expert was further questioned about the impact of missing either two days of work a month on a consistent basis or three days of work a month

1   unpredictably, she testified that employment would be completely negated. <u>See</u> Tr. 56-57.  But,

2   as discussed above, the substantial evidence in the record does not support a finding that plaintiff

3   experienced seizures frequently enough to result in that level of absenteeism, particularly given

4   that this limitation appears to be based solely on plaintiff's own testimony and self-reports, and

5   that the ALJ properly discounted his credibility in regard to his subjective complaints.  As such,

6   the ALJ did not err in determining plaintiff to be capable of performing either his past relevant

7   work and other jobs existing in significant numbers in the national economy, and thus in finding

8

9   him to be not disabled.

10                                    <u>CONCLUSION</u>

11          Based on the foregoing discussion, the Court finds plaintiff has not demonstrated that the

12   ALJ improperly determined him to be not disabled, and, accordingly, the Court hereby affirms

13   defendant's decision.

14          DATED this 25th day of February, 2011.

15

16

17

18                                    _____
                                      Karen L. Strombom
19                                    United States Magistrate Judge

20

21

22

23

24

25

26

ORDER - 21